| | | |
|---|---|---|
| GROK LINES, INC., individually and<br>on behalf of others similarly situated, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 08033 |
| | ) | |
| v. | ) | Judge Edmond E. Chang |
| | ) | |
| PASCHALL TRUCK LINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Grok Lines, Inc. seeks approval of a settlement agreement with Defendant Paschall Truck Lines, Inc., in this proposed class-action lawsuit brought under the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, *et seq.*[1] Under the terms of the deal, Grok Lines would get $1,500 and Grok Lines' attorneys, Siprut PC., would get $98,500. The class members would get *zero* money. Instead—despite the fact that money was available to pay the class, and that Paschall was willing to do so—the class would only get injunctive relief in the form of promises from Paschall not to violate the TCPA and to take steps to avoid future violations. As explained below, because this proposed settlement does not come close to meeting the standards of fairness and reasonableness, the motion for approval is denied.

---

[1] Federal-question jurisdiction is proper under 28 U.S.C. § 1331.

# I. Background

## A. Procedural History

Grok Lines filed this class action, through its attorneys Siprut PC, in October 2014, alleging that freight-carrier Paschall sent unsolicited junk-marketing faxes to Grok Lines and numerous other unwilling recipients. R. 1, Compl. ¶¶ 1, 18. Transmitting unwanted advertisements by fax is unlawful under the TCPA, 47 U.S.C. § 227(b)(1)(C), except in limited situations (for example, where a prior business relationship exists or the number was taken from a commercial directory of willing recipients). The price to be paid is actual damages or a statutory damages amount of $500 for each violation. *Id*. § 227(b)(3). After the Court dismissed a state-law claim for failure to state an adequate claim, and rejected Paschall's argument that, on the pleadings, its faxes did not constitute unlawful advertisement, R. 16, Minute Entry dated 11/17/2014, the parties embarked on discovery.

One important piece of information emerged early on: the size of the class (that is, the number of recipients of the Paschall fax) is about 180, all taken from a single list of fax numbers obtained from a non-party—a relatively low number that prompted the Court to accelerate class-certification discovery. R. 28, Minute Entry dated 1/28/2015 (noting estimate made by Defense counsel); *see also* R. 42, Exh. 2, Sam Royalty Decl. ¶¶ 3-4 (affidavit of Paschall director). Armed with this information, the parties carried on settlement negotiations. At some point, the parties agreed that Paschall would promise not to violate the TCPA again and to take steps to avoid TCPA violations—but no money would be paid to the class.

Instead, the parties then negotiated, with the requested help of the Magistrate Judge (who was not involved in the injunctive-relief aspect of the settlement), R. 31, 32, the attorney's fees and incentive award now proposed.

Grok Lines filed its motion for approval of the proposed settlement on June 27, 2015. R. 42, Mot. Based on Grok Lines' submission and doubts raised by the Court at the motion hearing about the propriety of the settlement, the Court ordered supplemental briefing. R. 45, Minute Entry dated 7/8/2015. The supplement was filed on July 30; in addition to supporting the initially proposed settlement, it suggested two alternative proposals involving donating either all of, or the attorney's-fees portion of, the settlement fund to charity if the Court were to reject the proposed injunctive-relief settlement. *See* R. 54, Supp. Br.

### B. Proposed Settlement

Under the terms of the proposed settlement, Paschall would be bound to comply generally with the TCPA and, more specifically, in case of any future faxes: to "take reasonable measures to verify that the recipient has expressly agreed to receive faxes" and "first attempt to obtain written confirmation"; to "maintain[ ] a record or log" of recipients who give only oral assent; to verify that, where Paschall uses a third-party to supply fax numbers, those recipients have given express consent; to verify that recipients of faxes who have an established business relationship with Paschall or whose fax numbers were obtained from a commercial database voluntarily gave their consent; to ensure that faxes contain information about how to opt-out of future faxes; and, to cease sending more faxes to those

parties that do opt out. R. 42, Exh. A, Proposed Settlement § 2.1. The settlement entails no payment of money damages to any class members, other than an incentive award to Plaintiff Grok Lines; specifically, Paschall will not oppose an application to the Court by Grok Lines for "an incentive award not to exceed $1,500." *Id*. § 2.1(j). Paschall would also be prohibited, under the agreement, from opposing before the Court an agreed-upon payment of $98,500 to Siprut PC as class counsel to cover attorney's fees, costs, and expenses. *Id*. § 2.1(i).

In exchange for these concessions, Grok Lines would provide Paschall with a general release from any existing causes of action. *Id*. at 7. The settlement is clear that as far as the proposed class is concerned, separate from the purported benefit of the injunction, any release of Paschall would "not include any claim for monetary relief." *Id*. at 8. The settlement also includes a provision through which Paschall would continue to deny any wrongdoing. *Id*. § 3.3(a).

## II. Legal Standards

Where a class-action settlement is sought, the district court must, of course, be certain that a class properly exists for that purpose. Fed. R. Civ. P. 23(a) lays out the familiar prerequisites for a certifiable class: numerosity, common questions of law or fact, claims or defenses of the representative parties that are typical of the class, and the ability of the representative parties to fairly and adequately protect class interests. *See generally Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (district courts must be mindful of various Rule 23 requirements during settlement-only class certifications). Even if a proposed class meets all of those

requirements, no settlement may be approved unless the district court "is convinced the settlement is 'fair, reasonable, and adequate.'" *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 634 (7th Cir. 2011) (quoting Fed. R. Civ. P. 23(e)(2)). Factors that must be weighed include: (1) "the strength of plaintiffs' case compared to the amount of defendants' settlement offer," (2) "an assessment of the likely complexity, length and expense of the litigation," (3) "an evaluation of the amount of opposition to settlement among affected parties," (4) "the opinion of competent counsel," and (5) "the stage of the proceedings and the amount of discovery completed at the time of settlement." *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996)).

The unfortunate reality is that "the structure of class actions under Rule 23 … gives class action lawyers an incentive to negotiate settlements that enrich themselves but give scant reward to class members, while at the same time … giv[ing] defendants an incentive to agree to early settlement that may treat the class action lawyers better than the class." *Thorogood v. Sears, Roebuck & Co.*, 627 F.3d 289, 293 (7th Cir. 2010) (emphases omitted). Therefore, far from acting as mere rubberstamp, courts must "exercise the highest degree of vigilance" in their review of class-action settlements, similar "to the high duty of care that the law requires of fiduciaries." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002) (analogizing court to fiduciaries of class members).

That said, "[i]n a certified class action, the court may award reasonable attorney's fees … that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). To determine reasonable fees, courts "must balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund." *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988). "The object in awarding a reasonable attorney's fee ... is to give the lawyer what he would have gotten in the way of a fee in arm's length negotiation, had one been feasible." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992).

### III. Discussion

### A. Elements of a Valid Class Appear to be Satisfied

As a threshold matter, the Court notes that the other Rule 23(a) requirements for a proper class appear to be met. The size of the proposed class, 180, satisfies the numerosity requirement. *See, e.g., McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002) ("Although there is no 'bright line' test for numerosity, a class of forty is generally sufficient to satisfy Rule 23(a)(1).") (citations omitted). Common questions of law or fact exist between class members, as their claims revolve around identical conduct, the bulk transmittal of the junk-fax. *See generally Savanna Grp., Inc. v. Trynex, Inc.*, 2013 WL 66181, at *10 (N.D. Ill. Jan. 4, 2013) (discussing "common nuclei of operative fact" in bulk-fax TCPA cases absent significant factual variations). On typicality, there are no discernible factual differences between Grok Lines' claim and the claims of other proposed class

members. *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) ("A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and ... are based on the same legal theory.") (citation and internal quotation marks omitted). Finally, there was no reason to doubt—other than the proposed settlement itself—that Grok Lines would try to fairly and adequately protect the interests of the class, given that it "possess[es] the same interest and [has] suffer[ed] the same injury as the class members." *Uhl v. Thoroughbred Tech. & Telecomm., Inc.*, 309 F.3d 978, 985 (7th Cir. 2002) (citation omitted).

Accordingly, there are no apparent concerns about the certification of the proposed class, although the question might need to be readdressed in more detail (depending on any changes in circumstances of the class) once an otherwise adequate settlement is submitted for review. It must be noted, however, that an important, related issue that the Court does not address at this time is the adequacy of the proposed class counsel, Siprut PC. *See* Fed. R. Civ. P. 23(g)(4) ("Class counsel must fairly and adequately represent the interests of the class."). That issue is reserved for fuller discussion in the context of a later settlement proposal, the need for which is discussed next.

### B. Proposed Settlement is Unfair, Unreasonable, and Inadequate

Plaintiff's counsel asks for approval of nearly $100,000 in attorney's fees—the entirety of the settlement fund (except for $1,500 to Grok Lines itself), a significant part of which even defense counsel concedes could just as easily go to satisfying the

monetary claims of class members—solely on the back of proposed injunctive relief that, on the record presented, offers no prospect of meaningful impact whatsoever on either the class members' interests or Paschall's future behavior. The motion must accordingly be denied. This decision is not, as Plaintiff's counsel argues, a suggestion that no fees "could *ever* be approved" with an injunctive-relief-only settlement. Supp. Br. at 4. It is the conclusion that *this* settlement is deficient.

### 1. The Proposed Injunction Is of Little to No Value

In Plaintiff's counsel's view, the "proposed settlement is in the best interest of Proposed Class members as it provides strong injunctive relief." Mot. at 16. In support of that contention, the supplemental brief characterizes the injunction as "demonstrably robust," and "superior to the injunctive relief achieved by other TCPA settlements." Supp. Br. at 4. At the hearing, attorney Joe Siprut also used the word "robust" to describe the injunction, adding that it was "quite substantial." Adjectives aside, Plaintiff's counsel misses a more fundamental point.

Sure, an injunction can be a powerful, long-lasting tool secured by a settlement in circumstances where it bars a party from doing something harmful that it has been doing, is currently doing, and will continue to do. But a settlement agreement that on paper appears to be a dam holding back a flood is superfluous if there is nothing to hold back. Here, the record shows that there was no reason to believe that Paschall would send out bulk advertising faxes again; not to Grok Lines, not to class members, not to anyone. The conduct at issue in this action was an isolated fax, which Paschall's counsel represented (without contradiction from

Grok Lines) was sent to various recipients based on the purchase of a single list of fax numbers. Defense counsel further represented that Paschall had never tried this tactic of fax-advertisements before and had made no plans to repeat it (which would be unsurprising, given the fallout in litigation costs the faxes have wrought).

Naturally, a TCPA-defendant might be expected to give such assurances about future good behavior—though not necessarily. A firm that regularly sends out business-related faxes (which it believes do not run afoul of the TCPA), and plans on continuing to use them as part of its marketing strategy, would not be expected to so easily swear away the practice, at least at this early stage of litigation with questions of liability still unresolved. When asked directly if discovery *in this case* had uncovered any objective basis to believe that Paschall might have designs on refaxing Grok Lines or anyone else, Plaintiff's counsel could not identify anything. Plaintiff's counsel's only proffered reasoning to support the necessity of the injunction was his speculation that because the defense had denied, during discovery-related conversations, that the faxes were unlawful, it was impossible to rule out potential future faxes from Paschall. But a *pro forma* denial of legal liability, with nothing more, should not be taken by a plaintiff's lawyer as a basis to ditch monetary relief and instead ask solely for injunctive relief out of purportedly intense concern for purported future violations. Discovery would reveal whether, as a genuine factual matter, fax-blasts are part of a business' established or planned marketing strategy. In other words, there was no objective reason (and Plaintiff's counsel has pointed to nothing, even in the supplemental brief) to think that the

allegedly unlawful faxes were anything but a one-time marketing experiment, or to fear that Paschall would repeat the mistake with anyone (let alone by sending it to the same class members), particularly in light of the headache it has caused Paschall.

Compare this case's situation with the backdrops of the cases that Plaintiff's counsel cites in support of the proposed settlement. Yes, attorney's fees were approved in connection with injunction-only settlements, but in those cases the injunctions actually meant something—restrictions on real, rather than theoretical, practices resulting in demonstrated present and future harm to class members. In *Padilla v. DISH Network LLC*, No. 12 CV 7350 (N.D. Ill. filed Sep. 13, 2012), for instance, the defendant, a satellite-television provider, agreed to stop its then-ongoing policy of indefinite retention of its customers' personal information, which allegedly violated federal and state law, and to modify its practices going forward. *See* No. 12 CV 7350, Order Granting Approval of Class Action Settlement, ECF No. 109; Settlement Agreement and Release, ECF No. 105 at Exh. 1. Every one of the remaining cited cases, save one, similarly involved settlements obligating defendants to modify, or stop altogether, practices and strategies that were part and parcel of a continuing business model. *See* Order Granting Preliminary Approval, *In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Practices Litig.*, No. 12 MD 2320 (D.N.H. June 5, 2015), ECF No. 93 (adopting agreement filed at ECF. No. 92 at Exh. 1) (manufacturer enjoined from continuing multistate marketing campaign boasting allegedly unproven efficacy of antibacterial soap);

*Lilly v. Jamba Juice Co.*, 2015 WL 2062858, at *2-4 (N.D. Cal. May 4, 2015) (approving settlement forcing national juice-seller to repackage line of challenged products, omitting allegedly deceptive "all natural" labeling); *Carr v. Tadin, Inc.*, 51 F. Supp. 3d 970, 974 (S.D. Cal. 2014) (company must repackage products to remove alleged misrepresentation); *Grant v. Capital Mgmt. Servs., L.P.*, 2014 WL 888665, at *2 (S.D. Cal. Mar. 5, 2014) (company required to prevent ongoing unlawful calls to non-land lines); *Jermyn v. Best Buy Stores, L.P.*, 2012 WL 2505644, at *3 (S.D.N.Y. June 27, 2012) (national chain retailer obligated to overhaul "price match" policy that was deceiving customers); Order Granting Class-Action Settlement Approval, *Claridge v. RockYou, Inc.*, No. 09 CV 6032 (N.D. Cal. Mar. 28, 2012), ECF No. 58 (adopting agreement filed at ECF No. 55 at Exh. 1) (technology company forced to identify and correct security deficiencies in maintenance of consumer records); *Kim v. Space Pencil, Inc.*, 2012 WL 5948951, at *6 (N.D. Cal. Nov. 28, 2012) (web technology company barred from surreptitiously collecting information on class members' internet browsing); *Chin v. RCN Corp.*, 2010 WL 3958794, at *4 (S.D.N.Y. Sept. 8, 2010) (approving settlement requiring cable company to cease practice of "throttling" some consumers' internet speed and noting in particular that the record indicated defendant would have continued practice absent settlement); *In re Lifelock, Inc. Mktg. & Sales Practices Litig.*, No. 08 MD 1977, 2010 WL 3715138, at *5 (D. Ariz. Aug. 31, 2010) (identity-theft protection company required to make changes to advertisements surrounding service guarantee, in light of separate Federal Trade Commission settlement providing for monetary recovery). In contrast

to the persistent alleged injury to consumers forestalled by the agreements in each of these actions, Plaintiff's counsel has pointed to zero tangible risk of repeated harm to the class.[2]

What's more, even if there had been some demonstrable risk that Paschall was going to push its luck by playing with TCPA-fire in the future, the settlement's purported burdens on Paschall are nothing more than ordinary steps that any business might take on its own in trying to comply with the TCPA. In trying to promote the strength of the injunction as more than this basic promise, Plaintiff's counsel emphasized that it would be in perpetuity, and "imposes policies and procedures that will affect [Paschall's] day-to-day operations for sending faxes." Supp. Br. at 7. But the perpetual duration of the injunction matters little when there was no real possibility of future fax blasting. And the actual terms of the proposed agreement—verifying that recipients had consented to receiving faxes, noting those who do agree, ensuring third-party lists are proper, ceasing to fax to opt-outs—amount to little more than a pledge to follow the law as written in the TCPA now. On the issue of consent, the settlement actually only provides that

---

[2]The only one of the cases cited by Plaintiff's counsel that is not clearly distinguishable in this way is *Goodman v. Casting360 LLC*, No. 12 CV 9851 (N.D. Ill filed Dec. 10, 2012), in which Siprut PC was also named class counsel. There, the court approved an injunction-only settlement, which included $27,000 in attorney's fees, against a talent agency that sent unwanted solicitations by text message. *See* Proposed Settlement Agreement, dated Feb. 2, 2013, ECF No. 9 at Ex. 1. It is unclear from the documents filed on the docket whether this was ongoing behavior, or more akin to Paschall's one-time experiment with fax blasts. In any event, the order granting approval did not explicitly discuss the issues raised in this Opinion. *See* Order Granting Settlement Approval, dated Mar. 6, 2013, ECF No. 11. Nor is *Goodman* binding on this Court. It is also worth noting that *Goodman* involved a much lower amount of fees sought (a little over one-quarter of the fees in this case).

Paschall would "attempt" to get written consent; there is no ironclad requirement in the agreement that written consent be obtained before sending a fax to the recipient. Proposed Settlement § 2.1. On record-keeping (even assuming the existence of any future fax-recipients), promising to keep fax-related written records does not amount to a forceful or meaningful concession. Businesses already have an incentive to keep those types of business records, namely, to track marketing success or failure. And the failure to maintain those records gives rise to the risk that a fact-finder later will draw a negative inference from the discarding of records. These incentives are already in place—without the proposed injunction.

The agreement's lack of value is further demonstrated by comparing the proposed injunctive relief with the kinds of affirmative concessions secured in other cases, including cases Plaintiff's counsel itself cites. These concessions include installing new technologies to prevent a re-occurrence; under-oath declarations to confirm compliance; mandatory training of employees; and outside audits. *See, e.g.,* *Grant*, 2014 WL 888665, at *2 (defendant required to adopt identifying and blocking technology it did not previously employ to ensure it did not make unlawful calls and to provide declarations under perjury every six months confirming compliance with injunction); *Best Buy Stores*, 2012 WL 2505644, at *3 (chain required to implement improved employee training, update description of policy on website, and carry out in-store modifications to retail practice); Settlement Agreement, *RockYou, Inc.*, (N.D. Cal. Dec. 15, 2011), ECF No. 55 at Exh. 1 (requiring outside audits for 36-month period). Compared to mandatory audits, required product changes,

compliance-verification reports, and the like, it is difficult to see how the proposed settlement here somehow "raises the bar" or is "demonstrably superior," Supp. Br. at 4, 7, to injunctions in other cases.

Ultimately, Plaintiff's counsel fails to show how the proposed injunction has real teeth. To be sure, Plaintiff's counsel is correct that the standard for approval is not whether the Court can fashion a conceivably "better" agreement, Supp. Br. at 5, meaning that it is not the role of the Court to substitute its preferences in place of the terms that the parties have negotiated, *see generally Uhl*, 309 F.3d at 986. But the problem with the proposed injunction here is not simply that it could be better in a general sense; it is that, for all the reasons discussed, the injunction fails to meet a minimal threshold of reasonableness and adequacy for its supposed beneficiaries, the class members.

### 2. Allocating Zero of the Settlement Funds to the Class Is Unacceptable

The feebleness of the proposed injunction is only part of the reason that the proposed agreement must be rejected. It is true that there could be cases in which a largely ceremonial injunction is all that can be extracted from an insolvent defendant (plus perhaps nominal attorney's fees and costs), and a plaintiff (and the plaintiff's attorney) might have to live with the hard fact of life that something very little is better than nothing.

That is not the situation here, despite Plaintiff's counsel's attempt to portray it as so. "Based on [Paschall's] size and resources," Plaintiff's counsel states as the premise of this settlement, "meaningful monetary relief under the TCPA is simply

not feasible." Mot. at 1. Yet the motion then seeks *$98,500* in attorney's fees that Paschall has agreed—and stands ready—to pay. And Paschall posed no obstacle in deciding whether to pay the class versus Plaintiff's counsel: at the July 8, 2015 hearing, when the Court directly asked defense counsel whether Paschall cared who would receive the money, the defense counsel responded that it makes no difference to his client whether the near-$100,000 is allocated entirely to the class, entirely to class counsel, or divided between the two. Which makes perfect sense: a defendant like Paschall "has no reason to care about the allocation of its cost of settlement between class counsel and class members; all it cares about as a rational maximizer of its net worth is the bottom line—how much the settlement is likely to cost it." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 783 (7th Cir. 2014).[3]

To put the $98,500 into context, and what it would represent in terms of satisfying the damages claims of the 180-member class, consider that the TCPA provides for a recovery of actual monetary loss or $500 in damages for each violation, whichever is greater, 47 U.S.C. § 227(b)(3)(B). (In cases where the violation is willful or knowing, the damages can increase up to treble damages. § 227(b)(3).) Practically speaking, in view of the extreme unlikelihood that a fax would cause more than $500 in harm, the statutory-damages figure will apply to most cases. Paschall is thus potentially on the hook for $90,000 in damages, based on $500 multiplied by 180 faxes (a finding of willfulness would expose Paschall to

---

[3]There is apparently no outside insurance backing any potential damages (the parties confirmed this during the July 8 hearing).

up to triple that amount).[4] In other words, if the $98,500 now devoted to attorney's fees had been designated for the class, and even if 100% of the class sent in a claim form (which is extremely unlikely), the settlement fund could actually have covered the full damages amount for the class. In other words, the class members could receive substantial recovery, especially when viewed relative to the maximum ($500) they could possibly win in a complete victory. Of course, it would be unfair to leave just $8,500 for the attorneys, and that too would not strike the right balance between, on the one hand, "their services rendered on behalf of the class" and, on the other, the "interests of the class members in the fund." *Skelton*, 860 F.2d at 258. The point is, however, that by the same token, neither does $98,500 for the attorneys and $0 for the class members.

In a pair of decisions from last year, the Seventh Circuit set forth the governing law on how to measure the reasonableness of a proposed settlement in the class-action context—a context in which the usual accuracy-enhancing function of the adversarial process is often missing, putting the duty on the district court to carefully scrutinize the proposal. In assessing the reasonableness of attorney's fees in class-action settlements, the Seventh Circuit held that, generally speaking, the "ratio that is relevant ... is the ratio of (1) the fee to (2) the fee plus what the class members received." *Pearson*, 772 F.3d at 781 (quoting *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014)). This ratio does not factor-in the lodestar

---

[4]Some courts do mention the possibility of reducing a damages award if the statutorily dictated amount would run afoul of a constitutional limit, such as due process. *See generally Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, 545 F. Supp. 2d 768, 778 (N.D. Ill. 2008).

(that is, hourly rate times hours worked), because "the central consideration" for determining the appropriate fee award remains "what class counsel achieved for the members of the class rather than how much effort class counsel invested in the litigation." *Redman*, 768 F.3d at 633. Allowing the lodestar to be the controlling factor in determining the reasonableness of the fee would allow "class counsel … to shift the entire risk of the litigation to their clients." *Id*. at 635. In other words, it puts the attorney's interest over the clients' interest to allow the attorney to pick the way to calculate fees based entirely on what is best for the *attorney*, that is, to demand and get the lodestar when the lodestar is more than a 33% or 40% contingency, and to demand and get the percentage contingency when the percentage is more than the lodestar. As against the client, heads-I-win, tails-you-lose in the attorney's favor cannot be the right. What *is* controlling is the ratio of the fee to the fee plus the benefit to the class.

Another governing principle made clear by recent cases is how to treat administrative costs. In evaluating the comparison between fee and class-benefit, the costs of administering the class (compiling class lists, sending out notices, processing claims, and so on) are generally *not* to be counted as benefits to the class members. *Pearson*, 772 F.3d at 781.[5] It is true that without class administration and the costs that go along with it, the class would get nothing, "[b]ut also without those costs class counsel would get nothing." *Redman*, 768 F.3d at 630. Moreover, if

---

[5]In this case, as confirmed by Plaintiff's counsel during the July 8 hearing, in light of the relatively small size of the class and the lack of complexity in claims processing, the potential costs of administration, including sending notice, would not be expected to be particularly high, whether viewed in absolute terms or in proportion to the size of a total settlement fund of around $100,000.

courts were to treat administrative costs as a benefit to the class, then courts would "eliminate[] the incentive of class counsel to economize on that expense—and indeed may … create[] a perverse incentive; for higher administrative expenses make class counsel's proposed fee appear smaller in relation to the total settlement than if those costs were lower." *Id.* So costs are generally not counted as part of the value of a settlement.

In addition to limiting the relevancy of the lodestar and of administrative costs, the Seventh Circuit also warns that the benefit to the class should generally be measured by what is *actually* received (or expected to be received) by the class, because the overriding concern for class counsel should be to "maximize the settlement benefits *actually received by the class*, rather than to connive with the defendant" in ways that "reduce the benefit to the class." *Pearson*, 772 F.3d at 781 (emphasis added). The specific problem that *Pearson* addressed was class and defense counsel crafting settlements where attorney's fees are purposefully measured against maximum *theoretical* payouts, when in reality claim-filings are in practice very low or, in worst-case scenarios, even discouraged. *Id.* (criticizing resulting *de facto* attorney's fee of 69 percent as "outlandish"). But both *Pearson* and *Redman* embraced a more fundamental principle from which the same maxim springs: where a settlement fund is in play, its allotment cannot reflect only the concerns of the plaintiff's counsel and the defense (or, by extension, only the self-interest of the former and the indifference of the latter). Generally speaking, the part of the fund representing fees should not be more than a reasonable percentage

of the total money ultimately being paid by the defendant to class members and counsel. *Id.* at 782 ("[E]specially in consumer class actions, where the percentage of class members who file claims is often quite low … we suggest [ ] that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total[.]"); *Redman*, 768 F.3d at 631 (criticizing a settlement scheme based on recoupment of variable-use coupons that "chip[s] away at the nominal value of settlement" for the class). To be sure, there is no hard-and-fast rule that the ratio should never be more than one-third or 40%. For example, if each class member's recovery is limited by statutory damages—as it is in this case—perhaps that would allow for a greater share of the settlement fund to go to fees (or a *cy pres*) if a larger payout to class members could be legitimately characterized as a windfall. Consider if 90 of the 180 class members in this case were to return claim forms (which might be a very high rate of claims-submission), and each of the 90 received $500 (the statutory damages amount), then the class would receive $45,000. Using 40% as the ratio between the fees and the fees plus the class benefit would work out to attorney's fees of $30,000. If Paschall were willing to pay $98,500 as a settlement fund, it would not necessarily be fair for the class members to receive the additional $23,500, because they would already have been made whole by the $500 statutory damages amount.[6] Depending on the reasonableness of the hours spent, it *might* be appropriate to award more in fees than the 40%. This is one example of where the lodestar might be relevant in arriving at a reasonable fee—but the lodestar would

---

[6] As noted above, it is possible to receive up to treble damages in cases of willful or knowing violations, so it would not necessarily be a windfall if class members received more than $500 each.

only be *part* of the analysis.[7] In contrast, the proposed settlement here sets attorney's fees at an indefensible 100% of the settlement fund (aside from the $1,500 incentive award to Grok Lines).

In this case, to justify taking the whole pie by virtue of the lodestar method, Plaintiff's counsel tried to explain why he abandoned pursuit of a monetary recovery for the class—and it just does not make sense. Plaintiff's counsel claimed that he initially pursued a Rule 23(b)(3) settlement (that is, a settlement with monetary recovery for class members), but then Plaintiff's counsel early on arrived at the conclusion that Paschall did not have enough money, and that the class size was small, and therefore the Rule 23(b)(3) settlement would not work. According to Mr. Siprut, it was only then that an injunction-only agreement, under Rule 23(b)(2), was reached, and it was only after *that* when the topic of attorney's fees was first broached. Only at that point—to put the story in the light most favorable to Plaintiff's counsel—did counsel then learn that Paschall could afford to pay $100,000.[8] That is the story in the light most *favorable* to Plaintiff's counsel,

---

[7]Indeed, the Seventh Circuit very recently reaffirmed a case where the lodestar made more sense to apply; at the same time, however, the Seventh Circuit emphasized again the need for close judicial scrutiny of class-action settlements and fee awards. In *In Re Southwest Airlines Voucher Litigation*, Nos. 13-2364. 13-3462, 14-2591, 14-2495, slip op. (7th Cir. Aug. 20, 2015), the Seventh Circuit upheld the reduction of a fee award—for the same Plaintiff's counsel here, Siprut PC—from $3 million to $1.65 million in a settlement requiring Southwest Airlines to reissue drinks coupons and enjoining it from unilaterally terminating coupon-validity in the future. *Id*. at 4, 21-22. Even though the class received just about complete and meaningful relief (a one-for-one reissuance of the coupons and an injunction against a repeat violation), the district court was correct not to simply defer to "the results of private negotiations," and instead correctly scrutinized the lodestar. *Id*. at 21-22.

[8]Paschall's counsel seemed to directly refute this account at the hearing, stating that the defense was never approached about a Rule 23(b)(3) settlement. Whether that is true or

because the other possible scenario paints an ugly picture: that before negotiating the zero-money-for-the-class settlement, counsel knew that Paschall could afford to pay tens of thousands of dollars into a settlement fund, but then counsel guided the negotiations into an injunctive-relief-only settlement to extract the full value of the settlement fund for himself. There is still a third possible scenario, less ugly but still representing a failure by Plaintiff's counsel to discharge his duty to the client: perhaps Plaintiff's counsel only had a general idea of the depth of Paschall's pockets and it was only in the fee-discussion context that the $100,000 figure came into focus, the amount coming as a (pleasant) surprise to counsel. Even in this scenario, however, there is no reason whatsoever that Plaintiff's counsel would be absolved from reopening discussions about monetary relief for the class—remember, Paschall does not care who gets what. There was nothing preventing Plaintiff's counsel, upon realizing the amount available (if indeed that is what happened), from putting a Rule 23(b)(3) agreement back on the table in such a case.

At the hearing, Mr. Siprut expressed what it was that purportedly prevented him from negotiating for the class to get some of the settlement fund. He argued, "loud and clear," that class counsel is not obligated to work as an "indentured servant at a loss." He declared that he is running a business, and should not have to

---

not, the proposed settlement is a prime example of the indifference of a defendant that just wants the case gone and the incentives of a plaintiff's counsel that wants as much of a return on investment—for counsel—as possible. *See Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014) ("[C]ourts have often remarked the incentive of class counsel … to agree[ ] with the defendant to recommend that the judge approve a settlement involving a meager recovery for the class but generous compensation for the lawyers.") (citations omitted). What Plaintiff's counsel appears to have secured is the equivalent of a "clear-sailing clause," where a defendant does not oppose a fee award up to a point (in this case, $98,500, or the entire settlement fund).

put in six months of work for only $35,000, which would be operating at a loss. In his words, counsel is supposed to be incentivized to get as robust a recovery as possible.

Counsel indeed *is* supposed to get as robust a recovery as possible—*for the class members*. By doing so, the return on his investment rises with the same tide. Certainly, every attorney hopes that each of his or her cases is a winner, to the point that the fee award will reflect something in the ballpark of the attorney's lodestar, that is, compensation for the actual labor the attorney put into it. But as every attorney knows just as well, not every case is a winner. And in that unfortunate circumstance, whether brought about by miscalculation, bad luck, or unforeseen events—no matter how many hours have been poured in before the awareness of trouble dawns—"the central consideration" for determining the appropriate fee award remains "what class counsel achieved for the members of the class rather than how much effort class counsel invested in the litigation." *Redman*, 768 F.3d at 633. What Plaintiff's counsel argued (in his words, "loud and clear") was nothing less than the gravely mistaken view that "class counsel [should be] able to shift the entire risk of the litigation to their clients," *Redman*, 768 F.3d at 635. Yes, Plaintiff's counsel is not an indentured servant to the class. He is a *lawyer* to the class, with all its attendant professional responsibilities. Yes, he is a businessperson too, but like all businesspeople he bears the risks of loss just as he reaps the fruits of profit. It is unacceptable to mitigate the risk of a relatively small payday by negotiating a settlement at the expense of clients.

In sum, the proposed agreement's division of settlement funds does not satisfy the requirements, as established by the Seventh Circuit, for a reasonable ratio of attorney's fees to class-member recovery. The proposed settlement can only be characterized as disproportionately benefiting counsel at the expense of class members, who gain little to nothing, the proposed injunctive relief having little or no value. And in view of the all-for-lawyer and zero-for-class flaw in the proposed settlement, the other traditional factors (such as the strength of the case and complexity of the litigation) do not come close to outweighing the flaw. Accordingly, it is unfair, unreasonable, and inadequate, and it cannot be approved.

### C. A New Settlement Should be Negotiated

After the Court posed questions about the settlement and ordered the supplemental brief, Plaintiff's counsel (in the supplement) declared that, because the implication that counsel had negotiated at the expense of the class was so disconcerting to counsel, the law firm would stipulate to: "paying the entire $98,500 [settlement fund] to a charity or legal aid organization" or distributing the sum "directly to the Class, less a 35% share given to charity (representing a hypothetical attorneys' fee payment … against the $98,500 'common fund')." Supp. Br. at 1-2. Obviously, neither of these proposals can simply be adopted on the basis of this proffer, assuming Plaintiff's counsel has even discussed them with Paschall. It should be noted, however, that the first proposal suffers from the same problem as the existing proposed settlement: the entire pie is not counsel's to give away, even if to charity. As for the second, if Siprut PC wishes to negotiate an attorney's fee

representing 35% of the common fund, assuming that the settlement is approved, what it chooses to do with that award, including donating to charity, is its prerogative.

What is clear is that if the parties want to settle this action, they will have to go back to the drawing board to craft an agreement that allocates the settlement fund between counsel and class members in a manner consistent with *Pearson* and *Redman*. Without prejudging any renegotiated agreement, the 35% figure suggested by Plaintiff's counsel would ordinarily fit in the range of acceptable fee awards described by the Seventh Circuit—that is, 35% of the fund left after administrative costs have been subtracted. *See Redman*, 768 F.3d at 630. The parties should keep in mind, however, that given the small class size, it is entirely possible that the number of claims filed might not be enough to tap the entirety of the theoretical 65% of the fund earmarked for class members, if a cap of the $500 statutory damages is applied (or even trebled to $1500, depending on the number of submitted claims). Whether that justifies additional fees, or suggests that a *cy pres* award is appropriate (given the circumstances, including the fact of this rejection), or calls for some other resolution is left to be decided when the concrete proposal is presented.

## IV. Conclusion

For the reasons discussed above, the motion for approval of the class-action settlement is denied. The approval hearing previously set for October 14, 2015, is converted to a status hearing, at which time the parties will report on the progress of settlement negotiations.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: September 18, 2015